**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOHNSON CONTROLS, INC., a Wisconsin
corporation, and JOHNSON CONTROLS
AUTOMOTRIZ MEXICO DE RL DE CV,
a foreign corporation,

               Plaintiffs,                       CASE NO. 06-15217
                                                  HON. LAWRENCE P. ZATKOFF

v.

TRW VEHICLE SAFETY SYSTEMS, INC.,
a Delaware Corporation,

               Defendant.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on June 7, 2007

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on the parties' cross-motions for summary judgment.

Plaintiffs' filed their Motion for Summary Judgment (Docket #7) on December 22, 2006, and

Defendant filed its Motion for Summary Judgment (Docket #15) on January 12, 2007. Each party

has responded to the others' motions and both parties have provided the Court with extensive briefs

and numerous exhibits. The Court finds that the facts and legal arguments are adequately presented

in the parties' papers and the decision process would not be significantly aided by oral argument.

Therefore, pursuant to E.D. MICH. LR 7.1(e)(2), it is hereby ORDERED that the motion be resolved

on the briefs submitted. For the reasons set forth below, both parties' motions will be DENIED.

## II. BACKGROUND

This case involves an alleged breach of an automotive supply contract. Plaintiffs Johnson Controls, Inc., and Johnson Controls Automortriz Mexico DE RL DE CV (collectively JCI) are engaged in the business of manufacturing interior automotive component systems, notably seat assemblies. (*See* Pls.' Compl. ¶ 8.) Defendant TRW Vehicle Safety Systems, Inc. (TRW), manufactures and supplies custom made automotive parts, including components to JCI's seat assemblies. (*See id.* ¶ 9.)

For the last several years, JCI has ordered certain component parts from TRW for the restraint systems of two General Motors vehicle platforms: the GMT 257 and the GMT 201. For the GMT 257 parts, JCI issued Purchase Orders 910-003 (Order 003) and 910-031 (Order 031).[1] (*See* Pls.' Ex. E, F.) For the GMT 201 parts, JCI issued Purchase Order 7002653 (Order 2653). (*See* Pls.' Ex. G.) JCI issued the purchase orders to TRW for the purchase of various parts for a period of one year. The purchase orders stated the specific price of each part but did not state the quantity. This was because JCI's need for parts depended on General Motor's production schedule. Accordingly, when JCI had a need for parts it would issue a material release to TRW, requesting that TRW ship a specified number of parts. JCI followed this practice, which is standard in the automotive industry and known as a just-in-time supply system,[2] in order to maintain a minimum inventory. JCI would

---

[1]For the sake of clarity, the Court will refer to the Purchase Orders collectively as "the purchase orders" or "the orders" unless the context demands further specificity.

[2]This type of supply system was analyzed in Omri Ben-Shahar & James J. White, *Boilerplate and Economic Power in Auto Manufacturing Contracts*, 104 MICH. L. REV. 953 (2006). In the article, Professors Ben-Shahar and White describe in detail the nature of contracts involved in supplying auto manufacturers with parts. These contracts are typically entered into with little or no negotiation and are primarily made up of carefully drafted boilerplate language. As in this case, the purchaser will issue a purchase order for a period of time at a fixed price that

periodically revise its purchase orders, which, according to the terms incorporated therein, would supercede previous purchase orders. JCI issued the latest revisions on February 21, 2006 for purchase orders 003 and 031, and on September 5, 2006, for purchase order 2653. (*See* Pls.' Ex. E-G.)

JCI's purchase orders detail the part number, the part description and the unit price. In the column labeled quantity, the orders state "AS REL."[3] (*See* Def.'s Ex. D, E.) The face of the orders also state:

> This purchase order is governed exclusively by Johnson Controls' Global Terms of Purchase (available at http://johnsoncontrols.com/asg/global-terms.htm or by calling 734-254-7500, and incorporated here by reference), except as modified provided therein. Any terms and conditions appearing on the reverse side of this purchase order form do not apply and should be disregarded. All other terms are rejected.

(*Id.*) JCI revises the Global Terms periodically; however, the revisions do not apply retroactively to purchase orders that have already been issued.[4]

The Global Terms identify each purchase order as an offer for the purchase of goods and further state in bold that the "Order is limited to and conditional upon Seller's acceptance of these Terms exclusively." (Def.'s Ex. F.) The agreement formed by the Order, including the Global Terms, is binding on the parties for one year. (*See id.*) Finally, under paragraph 3, labeled "Quantity;

---

incorporates Global Terms. "General Motors, for example, enters into roughly one million procurement contracts every year, at a total amount in excess of $80 billion–all governed by a single contract form containing thirty-one paragraphs ...." *Id.* at 957.

[3]Purchase Order 2653 does not have "AS REL." listed as the quantity; however, this purchase order does incorporate JCI's Global Terms.

[4] The Global Terms that apply to Purchase Orders 003 and 031, which were issued on February 21, 2006, were revised on December 1, 2005. The Global Terms that apply to Purchase order 2653, which was issued on September 5, 2006, were revised on March 12, 2006. There is no substantive difference between relevant provisions of the two versions of the Global Terms and the Court will not distinguish between the two versions unless necessary.

Material Releases; Delivery," the Global Terms state

> Quantities listed in each Order as estimated are Buyer's best estimate of the quantities of Supplies it might purchase from Seller for the contract term specified in the Order. If no other quantity is stated on the face of the Order or if the quantity is blank or states zero, "blanket," "see release" or similar term, then for consideration of US $10 to be paid by Buyer upon expiration or termination of the Order, Seller grants to Buyer an irrevocable option during the term of the Order to purchase Supplies in such quantities as determined by Buyer and identified as firm orders in material authorization releases, manifests, broadcasts, or similar releases ("Material Releases") that are transmitted to Seller during the term of the Order, and Seller will supply all such Supplies at the price and other terms specified in the Order; provided that the Buyer may purchase no less than a minimum quantity of at least one piece or unit of each of the Supplies and no more than 100% of Buyer's requirements for the Supplies. ... Material Releases are part of the Order, are governed by these Terms and are not independent contracts. ... Buyer is not obligated to accept early deliveries, late deliveries, partial deliveries or excess deliveries.

(*Id.*)

Sometime after JCI issued the purchase orders on February 21, 2006, it sent TRW material releases for the parts identified in these orders. TRW acted on the material releases and shipped the identified parts to TRW. According to JCI, TRW accepted JCI's offers to buy, as set forth in the purchase orders and Global Terms, when it shipped goods pursuant to the material releases JCI issued under the purchase orders. JCI further contends that a contract was formed that required TRW to supply JCI with its requirements for the parts identified in the purchase orders at the prices stated in the purchase orders for a duration of one year.

On February 23, 2006, TRW notified JCI that due to the increased cost of materials, it would be raising its prices for components sold to JCI. (*See* Pls.' Ex. H.) JCI responded that it could not pay higher prices for the parts it purchased from TRW because it could not control the pricing set by General Motors, and recommended that TRW discuss its pricing concerns directly with General Motors. (*See* Pls.' I.) In an email dated March 3, 2006, TRW notified JCI that it was objecting to the

inclusion of JCI's Global Terms in the purchase orders issued on February 21, 2006. (*See* Pls.' Ex.

DD.) Apparently, TRW had not been aware that the Global Terms existed prior to the issuance of

the February 21, 2006 purchase orders. (*Id.*)

Less than one week later, on March 8, 2006, TRW again notified JCI that it would be

increasing its prices for parts, but would honor the prices stated in JCI's purchase orders for the

material releases JCI had issued as of that date. (*See* Pls.' Ex. J.) In addition, TRW indicated that

unless JCI amended its purchase orders to reflect TRW's higher prices, it would cease shipping parts

once its obligations under the current material releases had been fulfilled. (*See id.*) On March 10,

2006, TRW again objected to JCI's Global Terms and expressed its belief that "its supply

agreements with Johnson Controls [were] binding only to the extent of [the] firm releases" that JCI

issued. (Def.'s Ex. 11.)

In response to TRW's statement that intended to cease shipping parts, JCI informed TRW

that the purchase orders were binding contracts that required TRW to supply JCI with parts at a fixed

price for the duration of the order. (*See* Pls.' Ex. K.) JCI further stated that TRW's threat to stop

shipping constituted a breach of the contracts and that if TRW stopped shipping parts General

Motors would have to stop production on the affected vehicles. (*See id.*) Accordingly, JCI requested

assurances from TRW that it would continue to ship parts as scheduled. (*See id.*) On March 21,

2006, TRW assured JCI that it would continue to ship parts as scheduled and rescinded the letter that

threatened to stop shipment. (*See* Pls.' Ex. L.) However, ten days later, TRW sent JCI another letter

notifying JCI of TRW's intent to not renew the current purchase orders once they expired. (*See* Pls.'

Ex. M.) In this letter, TRW relied on a provision in JCI's Global Terms that required the seller to

notify JCI of an intent to not renew a purchase order 180 days before the order is set to expire. (*See*

Pls.' Ex. F.)

Throughout the summer of 2006, JCI continued to issue material releases and TRW continued to ship parts to JCI. Nevertheless, in October 2006, TRW again demanded that JCI revise its purchase orders to reflect the increased cost TRW was paying for materials. (*See* Pls.' Ex. P.) JCI informed TRW that based on the February 21, 2006, purchase orders, TRW was obligated to continue shipping parts at the current prices until February 21, 2007. (*See* Pls.' Ex. S.) Likewise, JCI expressed its belief that under the purchase order issued on September 5, 2006, TRW was obligated to continue shipping parts at the current prices until September 5, 2007. (*See id*.)

On October 11, 2006, when JCI refused to negotiate a price increase, TRW reconfirmed its intent to not renew the purchase orders and threatened to stop shipping parts as of October 29, 2006. (*See* Pls.' Ex. T.) As it had done in March, JCI demanded assurances from TRW that shipments would continue on time. (*See* Pls.' Ex. V.) This time, however, TRW stood by its threat to stop shipments. (*See* Pls.' Ex. W.) Because it did not want to damage its relationship with General Motors or cause production to cease, JCI issued revised purchase orders that reflected TRW's increased prices. (*See* Pls.' Ex. A, B, Z.) This suit followed.

JCI's complaint alleges that TRW breached the contracts embodied in Purchase Orders 003 and 031 when it threatened to stop shipping parts in October 2006. Furthermore, the complaint seeks a declaratory judgment as to Purchase Order 2653, declaring that purchase order to be a valid and enforceable contract through September 2007.

### III.  LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *accord Turner*, 412 F.3d at 637. When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249 (citations omitted). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

These same rules of review also apply where the parties have filed cross-motions for summary judgment. *Westfield Ins. Co. v. Tech Dry Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). The court must evaluate each motion on its own merit and draw inferences against the party whose motion is being considered. *In re Markowitz*, 190 F.3d 455, 463 n.6 (6th Cir. 1999). Just because both sides have filed motions for summary judgment does not mean that the case must be decided by summary judgment. *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The filing of a motion for summary judgment by one party also does not preclude that party from arguing that there are issues of fact which preclude the granting of summary judgment to the adversary party. *See Cherokee Ins. Co. v. E.W. Blanch Co.*, 66 F.3d 117, 123 n.4 (6th Cir. 1995).

## IV. ANALYSIS

### A. TRW's Motion for Summary Judgment

TRW's primary argument is that it did not breach the parties' contract because no

enforceable contract existed. Specifically, TRW contends that the documents presented by JCI to support a contract fail the statute of frauds' requirement that a quantity term appear in the writing. TRW further argues that even if the statute of frauds is satisfied, the contract fails for lack of consideration because JCI is not obligated to purchase any parts from TRW. In response, JCI argues that the contract sufficiently states a quantity term and is not lacking in consideration under Michigan's version of the Uniform Commercial Code (UCC), Mich. Comp. Laws §§ 440.1101 *et seq*. As explained below, the Court finds that the statute of frauds does not bar enforcement of the parties agreement but questions of fact remain as to whether the agreement is lacking in mutuality.

### 1. Whether the Purchase Orders Satisfy the Statute of Frauds

Michigan's statute of frauds provides:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $1000.00 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for the sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in the writing.

Mich. Comp. Laws § 440.2201(1). The writing evidencing a contract has three "definite and invariable requirements." *Id.* cmt 1. "First it must evidence of contract for the sale of goods; second, it must be 'signed'... and third, it must specify a quantity." *Id.* The Michigan Supreme Court has thus found that a quantity term must appear in the writing in order to satisfy the statute of frauds. *Lorenz Supply Co. v. American Standard, Inc.*, 419 Mich. 610, 614 (1984). However, "[o]nce a quantity term is found to exist in the agreement, the agreement need not fail because the quantity term is not precise." *In re Estate of Frost*, 130 Mich. App. 556, 561 (1983). This is because the purpose of the writing requirement is "to provide a basis for believing that oral evidence which is offered rests upon

a real transaction." *Id.* Once this purpose has been satisfied, parol evidence may be admissible to make the agreement sufficiently definite to be enforceable. *Id.* Accordingly, "[w]hen quantity is not precisely stated, parol evidence is admissible to show what the parties intended as the exact quantity, ... but where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term." *Id.* (quoting *Alaska Independent Fisherman's Marketing Ass'n v. New England Fish Co.*, 15 Wash. App. 154, 159-60 (1976)) (internal quotation marks omitted). Therefore, the issue in this case is whether the writings offered by JCI as evidence of the parties' contracts contain a written quantity term.

TRW argues that the writings JCI provided do not contain a quantity term. TRW points out that the quantity column on the purchase orders either states "AS REL." or does not state anything at all. Further, TRW argues that JCI's Global Terms define "AS REL." as merely granting JCI an option to purchase parts for the duration of the order, and has no connection to quantity whatsoever. On the other hand, JCI contends that its Global Terms do contain a quantity term in that the definition of "AS REL." states that TRW grants JCI an option to purchase parts at a set price for the duration of the order so long as JCI purchases at least one part but no more than 100% of its requirements. In addition, JCI notes that the Global Terms also specifically incorporate any material releases issued under the purchase orders. JCI argues that the reference to the material releases, combined with the range of quantities qualifying the option to purchase, constitutes a written quantity term.

In order to determine the sufficiency of the writing, the Court must look to Michigan law. *See Erie R. R. v. Tompkins*, 304 U.S. 64, 78 (1938). In applying Michigan law, the Court follows the law as announced by the Michigan Supreme Court. *Rector v. General Motors Corp.*, 963 F.2d 144,

146 (6th Cir. 1992). Where the Michigan Supreme Court has not decided the issue, the Court "must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (quoting *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)). "Relevant data includes state appellate court decisions, supreme court dicta, restatements of law, law review commentaries, and [the] majority rule among other states." *Orchard Group Inc. v. Konica Medical Corp.*, 135 F.3d 421, 427 (6th Cir. 1998). While the Michigan Supreme court has clearly found that a quantity term must appear in the writing to satisfy the statute of frauds, it has not decided what is sufficient to qualify as a quantity term. Therefore, the Court will look to "all relevant data" to determine whether the writings provided in this case contain a quantity term.

The Michigan court of appeals has addressed this issue with varying results. The court first found that a quantity term must appear in the writing in *Ace Concrete Prods. Co. v. Charles J. Rogers Constr. Co.*, 69 Mich. App. 610 (1976). *Ace Concrete* involved a contract between a concrete supplier and a concrete subcontractor. The supplier sent the subcontractor a letter quoting prices for concrete in connection with a specified construction contract. *See id.* at 611. The letter referenced the specific construction contract for which the subcontractor would need concrete, "P.C.I-13 Job 1450," and stated "[m]ay we give you the following price quote on concrete for the above job." *Id.* The subcontractor argued that the contract was unenforceable under the statute of frauds because it did not state a written quantity term. The court agreed, rejecting the supplier's argument that letter's reference to the construction project in combination with the quote "for the above job" revealed a requirements contract. *Id.* at 614. The court concluded that the quantity "must appear on the [writing] without reference to parol evidence." *Id.*

The court reached the opposite result in *In re Estate of Frost*, 130 Mich. App. 556 (1983).

There, the plaintiff claimed to have had a contract with the decedent for the sale of lumber. The defendant argued that the contract was not enforceable under the statute of frauds because it did not state a quantity. The court disagreed with the defendant and found that the writing's statement that the plaintiff could take "all wood sawable" was a sufficient quantity term for the statute of frauds, analogizing the contract to an output contract. *Id.* at 560-61. The court stated that the statute of frauds was satisfied even though the quantity term was not precise. *Id.*

Similarly, in *Great Northern Packaging, Inc. v. General Tire & Rubber Co.*, 154 Mich. App. 777 (1986), the court concluded that a term with no apparent reference to a specific quantity could satisfy the statute of frauds. In that case, the buyer issued a purchase order to buy 50 units that was later changed to a "Blanket Order" purportedly covering purchases for one year. *See id.* at 780. Relying on the court's holding in *Frost*, the court concluded that "the term 'blanket order' express[ed] a quantity term, albeit an imprecise one." *Id.* at 787. As the statute of frauds' purpose of providing a basis for believing a contract exists had been fulfilled, the court recognized that parol evidence should be admitted to the trier of fact to determine the precise quantity of units involved in the contract. *See id.*

In *Acemco, Inc. v. Olympic Steel Lafayette, Inc.*, 2005 WL 2810716 (Mich. App. 2005), the court found that the writing offered to satisfy the statute of frauds did not contain a quantity term. The writing stated that "[d]uring the term of this Agreement, the Seller agrees to sell to the Buyer such quantities of the Products as the Buyer may specify in its purchase orders, which the Buyer may deliver at its discretion." *Id.* at *4. The court found that the above language was not a quantity term because it specified "no quantity whatsoever." *Id.* The court reasoned that the language granted the buyer complete discretion to order any amount or no amount of the seller's products and

concluded that "'[a]ny' quantity is in fact no quantity at all." *Id.* The court further rejected the seller's argument that the term "blanket" on an attached document constituted a quantity term. "Blanket" appeared on a document that described the goods to be purchased. *Id.* The court concluded that, unlike *Great Northern*, where the court held that the term "blanket order" stated a quantity, *see Great Northern*, 154 Mich. App. at 787, "blanket" on its own was not a quantity term. The court further explained that since the term appeared on a specifications sheet and not a purchase order, and since the term was "blanket" and not "blanket order," the writing did not contain a quantity term. *See Acemco*, 2005 WL 2810716, *4.

Finally, the court in *Dedoes Indus., Inc. v. Target Steel, Inc.*, 2005 WL 1224700 (Mich. App. 2005), held that a price quote stating that the defendant "would satisfy plaintiff's steel needs" for three years did not satisfy the statute of frauds' quantity requirement. *Id.* *2. The court found the language referenced a time period and not a quantity. *See id.* Other courts have discussed Michigan's quantity requirement with differing results. *Compare Busch v. Dyno Nobel, Inc.*, 40 Fed. App'x 947 (6th Cir. 2002) (concluding that the language "up to ten million pounds" could constitute an ambiguous quantity term), *with MacSteel, Inc. v. Eramet North America*, 2006 WL 3334019 (E.D. Mich. 2006) (finding the term "additional material" was too indefinite to obligate the plaintiff to purchase any goods and, therefore, failed to satisfy the statute of frauds).

The Fourth Circuit also discussed this issue in *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791 (4th Cir. 1989). In *Lorillard*, the defendant, a cigarette manufacturer, agreed to supply the plaintiff, a cigarette wholesaler, with its full line of cigarettes on a direct basis. *See id.* at 793. When the plaintiff began drastically increasing its orders, the defendant suspended a previous credit arrangement and demanded cash payments for purchases. The plaintiff sued and the defendant

argued that the statute of frauds prevented enforcement of the alleged contract. The plaintiff

contended that the terms "full line" and "direct basis" provided a quantity term in that they provided

that the defendant would supply all of the plaintiff's requirements. *See id.* The court of appeals

reviewed Maryland law and found no case in which similar terms were found to satisfy the statute

of frauds quantity requirement. The court summarized those decisions:

> [I]nstructive are cases in which ambiguous terms of quantity have been deemed
> sufficient to prove an enforceable contract. This court, for example, recently held that
> quantity was adequately identified when specific language "referred to meeting the
> purchaser's needs." *Barber and Ross Co. v. Lifetime Doors, Inc.*, 810 F.2d 1276,
> 1280-81 (4th Cir. 1987). *See also Kansas Power and Light Co. v. Burlington
> Northern Railroad Co.*, 740 F.2d 780 (10th Cir. 1984) (writings mentioning possible
> maximum and minimum amounts of shipped coal sufficient to create requirements
> contract). It has been held that the words "the yarn" for "a potential program" could
> be sufficient written expression of quantity. *O. N. Jonas Co., Inc. v. Badische Corp.*,
> 706 F.2d 1161, 1163-64 (11th Cir. 1983). Courts have consistently found that words
> with some possible nexus to amount, including "all," "bags," or even customary
> terms such as lot numbers, can provide a basis for the admission of parol evidence.
> *See also Maryland Supreme Corp. v. The Blake Co.*, 279 Md. 531, 369 A.2d 1017
> (1977) (written phrases "for the above mentioned project" and "throughout the job"
> are sufficient quantity terms).

*Id.* at 794-95. In light of these cases, the court concluded that the terms "full line" and "direct basis"

had no nexus to quantity and, therefore, did not satisfy the statute of frauds. *Id.* at 795.

The Court finds little guidance in the cases discussed above but is persuaded by the

reasoning in cases such as *Great Northern* and *Frost*. The Court finds these cases provide a more

reasoned analysis of the issue and are consistent with the UCC's policies as well as the commercial

background of the parties and the transaction involved in this case. In contrast, the Court finds that

the decisions in *Ace Concrete*, *Acemco*, and *Dedoes* conflict with the UCC's goals and confuse the

issue of whether the quantity term is sufficiently definite to enforce the contract with the issue of

whether there is a written quantity term for the purposes of satisfying the statute of frauds. *See*

*Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 789 (5th Cir. 1975) (refusing to apply the statute of frauds to bar enforcement of a contract and stating that "the real issue in this case is not whether these contracts satisfy § 2-201, but whether the quantity term in the agreement the parties undeniably made–as reflected in the signed writing–is too indefinite to support judicial enforcement"). The results reached in *Ace Concrete*, *Acemco* and *Dedoes* minimally advance the statute of frauds' purpose to provide a basis for believing a contract exists while at the same time damaging the UCC's other substantive goals of liberally incorporating trade usage, custom and practice, course of dealing, and course of performance into parties' agreements in fact.

The UCC strives to "simplify, clarify and modernize the law governing commercial transactions ... [and] to permit the continued expansion of commercial practices through custom, usage and agreement of the parties ...." MICH. COMP. LAWS § 440.1102. The "general approach" of the UCC "requires the reading of commercial background and intent into the language of any agreement and demands good faith in the performance of that agreement." MICH. COMP. LAWS § 440.2306 cmt. 1. The Court is also mindful that in determining whether a particular term is in fact a quantity term, the Court's construction of the statute of frauds' quantity requirement affects the substance and application of other code provisions. "The text of each section should be read in the light of the purpose and policy of the rule or principle in question, and also as of the Act as a whole, and the application of language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved." MICH. COMP. LAWS § 440.1102 cmt. 1.

The statute of frauds expressly states that "[a] writing is not insufficient because it omits or incorrectly states a term agreed upon ...." MICH. COMP. LAWS § 440.2201(1). Furthermore, "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the

parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." MICH. COMP. LAWS § 440.2204(3). The official comment to § 2204(3) states:

> If the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy. *The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff.* Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement. *Rather, commercial standards on the point of 'indefiniteness' are intended to be applied, this Act making provision elsewhere for missing terms needed for performance ....*

*Id.* cmt. 1 (emphasis added). To this end the code specifically contemplates contracts with indefinite quantity terms. *See* MICH. COMP. LAWS § 440.2306 (defining quantity in output or requirements contracts as actual good faith output or requirements). Therefore, the Court declines to analyze the purported quantity term in this case in terms of its definiteness. Whether the quantity as provided in the writing is sufficiently definite to support an enforceable contract is to be determined under the codes' substantive provisions in light of commercial standards. *See* Caroline N. Bruckel, *The Weed and the Web: Section 2-201's Corruption of the U.C.C.'s Substantive Provisions–The Quantity Problem*, 1983 U. ILL. L. REV. 811 (1983).

In the present case, the purchase orders, in combination with the Global Terms, contain a quantity term. The face of the purchase orders state "AS REL." in the column labeled quantity. There is no dispute that this term is a reference to JCI's material releases, which it issued periodically to specify the exact quantities of parts needed. The Court finds no difference between this term and those found to be sufficient in *Great Northern* and *Frost*. The purchase orders contemplate that JCI would identify specific quantities in material releases and expressly included those releases in the orders. The term "AS REL." gives some indication that JCI intended to purchase and TRW intended to sell some quantity of parts. This is all the statute of frauds requires.

Interestingly, based on the reasoning in *Acemco*, the fact that "AS REL." was listed as the quantity and was included on actual purchase orders reinforces the conclusion that some quantity term, although indefinite, was stated in the writing. Additionally, in contrast to the terms found insufficient in *Lorillard*, "AS REL." does have some nexus to the notion of amount or quantity in light of the customary practice in the automotive industry of using just-in-time supply chains and material releases.

Furthermore, the fact that the Global Terms explain that "AS REL." indicates that JCI has an option to purchase supplies does not change the fact that there is some quantity term. *See*, *e.g.*, *R. A. Weaver & Assocs., Inc. v. Asphalt Construction, Inc.*, 587 F.2d 1315, 1319 (D.C. Cir. 1978) (finding that a quantity term was stated in the writing even though the language stating the quantity also spoke of the grade and quality of concrete). If anything, the precise meaning of the term is ambiguous. But as the statute of frauds specifically states, the terms need not be accurately stated. In this case, the quantity could be construed as simply referencing the amount of supplies indicated in the material releases. The releases are incorporated into the purchase orders via the Global Terms and JCI is not obligated to purchase anything that exceeds the amounts stated in the material releases. On the other hand, the fact that the Global Terms referenced an option to purchase goods at a fixed price so long as JCI's orders were within a specific range of amounts could indicate that JCI was to purchase its requirements. *See*, *e.g.*, *Burlington Northern*, 740 F.2d 780 (writings mentioning possible maximum and minimum amounts of shipped coal sufficient to create requirements contract). That this may have been a requirements contract seems reasonable in light of the practice among automotive suppliers to enter into long-term, just-in-time production arrangements that rely on a fixed price and a variable quantity, and provide flexibility to adjust to

changing commercial conditions.[5]

Based on the foregoing analysis, the Court finds that JCI's purchase orders in combination with its Global Terms contain a satisfactory quantity term for the purposes of MICH. COMP. LAWS § 440.2201. The Court concludes that a quantity term appears in the writing, albeit an ambiguous one, and that the offered writings provide a basis for believing that a contract in fact exists. Thus, the purpose of the statute of frauds has been satisfied, particularly to the extent performance has been rendered. *See* MICH. COMP. LAWS § 440.2201(3)(c) (stating that in the absence of a writing sufficient to satisfy the statute of frauds, the parties agreement is enforceable "with respect to goods for which payment has been made and accepted or which have been received and accepted").

### 2. *Whether JCI's Promise is Illusory*

Aside from its statute of frauds argument, TRW argues that the parties' agreement is not enforceable because JCI's promise is illusory and, therefore, lacks consideration. JCI counters that as a requirements contract, it is obligated to buy its good faith requirements from TRW, which is sufficient consideration under the UCC. The Court finds that questions of fact exist as to whether the parties' agreement is unenforceable for lack of consideration. The district court's opinion in *General Motors Corp. v. Paramount Metal Prods. Co.*, 90 F. Supp. 2d 861 (E.D. Mich. 2000), is particularly instructive.

In *General Motors*, the plaintiffs contracted with the defendant under several purchase orders for the manufacture of automobile seat frames to be installed in the plaintiffs' vehicles. *See id.* at

---

[5]As mentioned above, Purchase Order 2653 does not state "AS REL." as the quantity, but incorporates the Global Terms. The Global Terms state that where no quantity is listed on the purchase order, JCI has an option to purchase goods for the duration of the order so long as it purchases no less than one unit and no more than 100% of its requirements. Pls.' Ex. G.

864. The purchase orders extended for several years and the defendant was the plaintiffs' sole source of supply. *See id.* The plaintiffs engaged in a just-in-time supply system where they depended on the defendant to maintain a continuous source of supply. *See id.* During the course of the orders, the defendant began experiencing financial difficulties and demanded that the plaintiffs pay higher prices for the seat frames or else the defendant would cease shipments. *See id.* After lengthy negotiations, the parties reached an agreement whereby the plaintiffs would ultimately pay higher prices for the seat frames than the original purchase orders required. *See id.* at 864-65. The plaintiffs initiated a suit alleging, among other things, that the defendant breached the various purchase order contracts. *See id.* at 865. The defendant argued that the purchase orders, which permitted the plaintiffs to unilaterally terminate the orders and did not require the plaintiffs to buy any parts from the defendant, lacked the requisite mutuality of obligation and consideration to form a contract. *See id.* at 873. The court disagreed.

Relying on the provision for requirements contracts, MICH. COMP. LAWS § 440.2306, the court found that the parties' agreement did not lack mutuality of obligation because the plaintiffs were bound by a duty of good faith. *See General Motors*, 90 F. Supp. 2d at 873. The court found that the evidence, when construed in the light most favorable to the plaintiffs, showed that there was a genuine issue of material fact as to whether the contracts were requirements contracts. *See id.* As such, "[i]f in bad faith or inconsistent with commercial standards of fair dealing, the plaintiffs exercised a unilateral right not to purchase seat frames or to terminate the purchase orders, the plaintiffs would be subjected to liability for breach of contract." *Id.* The court further explained that "[t]his same reasoning holds true had the plaintiffs acted in bad faith and not issued a release." *Id.* Consequently, the court denied the defendant's motion for summary judgment.

The Court finds the reasoning in *General Motors* persuasive. "A term which measures the quantity by ... requirements of the buyer means such actual ... requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior ... requirements may be tendered or demanded." MICH. COMP. LAWS § 440.2306(1). Comment 2 to this section states:

> Under this Article, a contract for output or requirements is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure.

*Id.* cmt. 2. "A promise to buy of another person or company all or some of the commodity or service that the promisor may thereafter need or require in his business is not an illusory promise and such a promise is sufficient consideration for a return promise." *General Motors*, 90 F. Supp. 2d at 873 (quoting *Precision Rubber Prods. Corp. v. George McCarthy, Inc.*, 872 F.2d 187, 188 (6th Cir. 1989)).

Viewing the evidence in the light most favorable to JCI, questions of fact remain as to whether the parties intended a requirements contract. The language included in the Global Terms could be construed as permitting JCI to purchase its requirements from TRW for the duration of the purchase order. As the court in General Motors recognized, if in bad faith or inconsistent with commercial standards of fair dealing, JCI decided not to purchase parts from TRW, terminate the purchase orders, or not to issue material releases, it would be liable for breach of contract. Moreover, Michigan does not require that requirements contracts be exclusive to be enforceable. *Plastech Engineered Prods. v. Grand Haven Plastics, Inc.*, 2005 WL 736519 (Mich. App. 2005) (per curiam)

(citing *General Motors*, 90 F. Supp. 2d at 873). Further, there is conflicting evidence as to whether JCI is bound by its contract with General Motors to purchase its parts from TRW, which would further limit its freedom of action and provide further consideration for the contracts with TRW. Finally, the parties' past dealings and current course of performance may indicate that a requirements contract was intended. *See*, *e.g.*, *Metal One America, Inc. v. Center Mfg., Inc.*, 2005 WL 1657128 (W.D. Mich. 2005) (relying on the parties' course of performance and past dealings to find that a requirements contract existed). Therefore, the Court cannot say that the contract was unenforceable for lack of mutuality or that JCI's promise was illusory. Thus, TRW's Motion for Summary Judgment must be denied.

## B. JCI's Motion for Summary Judgment

In support of its motion, JCI argues that its purchase orders combined with TRW's performance formed a valid and enforceable requirements contract and that TRW breached the contract when it unilaterally raised the prices for parts. As further evidence of the contract, JCI points to the fact that TRW was its sole supplier of the parts covered by the purchase orders during the relevant time period and that TRW consistently performed pursuant to JCI's material releases. On the other hand, as discussed above, TRW argues that no enforceable contract existed between the parties. For the same reasons the Court rejected TRW's statute of frauds argument and lack of consideration argument, the Court rejects TRW's arguments in opposition to JCI's motion. Similarly, the Court finds that material questions of fact exist that preclude the Court from granting JCI's motion.

Notwithstanding the Court's finding that the statute of frauds does not render the parties' agreement unenforceable, JCI still has the burden of proving that a contract in fact exists, the terms

of the contract, and that TRW's actions constituted a breach of that contract. "The statute of frauds is only one of many potential barriers to the enforcement of agreements." *Reigel Fiber*, 512 F.2d at 788-89. "[A] complying memo is no equivalent to victory .... [It] is not conclusive proof of the existence of the [] contract, let alone its terms." JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 2-3 (4th ed. 1995).

JCI argues that a contract was formed when TRW shipped goods based on the purchase orders. "A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." MICH. COMP. LAWS § 440.2204(1). Furthermore, "[a]n agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." MICH. COMP. LAWS § 440.2204(2). Finally, "[u]nless otherwise unambiguously indicated by the language or circumstances ... an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods ...." MICH. COMP. LAWS § 440.2206. Viewing the evidence in the light most favorable to TRW, the Court finds that genuine issues of material fact exist that preclude the Court from granting JCI's motion.

In the present case, it is not clear when JCI's Global Terms were first placed in a purchase order. While the terms were revised on December 1, 2005, and March 12, 2006, the purchase orders that JCI claims constitute the parties' contracts were issued on February 21, 2006, and September 5, 2006. Prior to December 1, 2005, it appears that JCI's terms and conditions were included on the reverse side of its purchase orders. After December 1, 2005, JCI began posting its extensive terms on its website and incorporating them into purchase orders by reference. More significantly, it is

unclear when TRW first shipped goods to JCI pursuant to a purchase order that included the Global Terms. Moreover, TRW notified JCI of its objection to the Global Terms in a letter dated March 3, 2006. Thus, assuming JCI's purchase orders constituted offers to buy, questions of fact remain as to when TRW accepted these offers by shipment, if at all, and what terms TRW accepted, if any.

Viewing the evidence in the light most favorable to TRW, if the February 21, 2006, purchase orders were the first purchase orders to incorporate the Global Terms, and assuming that TRW did not immediately ship goods under these purchase orders, the record does not support a finding that TRW accepted the terms of the purchase orders by shipment. Rather, it is entirely possible that TRW objected to the Global Terms on March 3, 2006, and shipped the parts following the objection. While the parties' conduct indicates that some sort of agreement had been reached, without further evidence the Court is unable to determine the nature of that agreement or its terms. While JCI contends that the purchase orders were long term contracts, TRW states that it was only obligated to provide parts according to JCI's material releases. The parties' conduct is consistent with both interpretations. Consequently, the Court cannot say whether or not there was a breach.

As for JCI's request that the Court declare Purchase Order 2653 to be a valid contract, it appears that TRW did not accept the terms in the September 5, 2006, purchase order: TRW had objected to the Global Terms at least twice prior to the alleged revision in September, which purports to supercede any prior agreement. Therefore, the Court cannot say that TRW accepted JCI's Global Terms when it shipped goods after receiving JCI's September 2006 revision to purchase order 2653. Again, while the parties' conduct indicates that an agreement exists, further evidence is required to determine the nature and terms of the agreement, and consequently, its validity. Accordingly, JCI's Motion for Summary Judgment must be denied.

## V. CONCLUSION

In the present case, neither party has met its burden under Rule 56(c) to show the absence of a material fact for trial. The Court concludes that the statute of frauds does not bar enforcement of the parties' agreement in this case and that questions of fact remain as to whether the agreement is unenforceable for lack of consideration. Further, the Court concludes that questions of fact remain as to the nature of the parties agreement and its terms. Therefore,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is DENIED and that Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.


s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: June 7, 2007

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on June 7, 2007.


s/Marie E. Verlinde
Case Manager
(810) 984-3290